WESTERN ASSURANCE COMPANY *v.* ALTHEIMER.

Opinion delivered March 24, 1894.

1. *Fire insurance—Warranty as to keeping books.*

In an action upon a policy of fire insurance, which stipulated that assured should "keep a set of books showing a complete record of all business transacted, including all purchases and sales both for cash and credit," where the evidence showed that assured kept no other record of sales for cash than a daily entry upon the books showing the aggregate amount of cash sales, without giving the items of merchandise sold, or the separate amounts for which such merchandise was sold, and where expert bookkeepers testified that the record of cash sales as kept on assured's books was complete, the court properly left it to the jury to determine whether assured had complied with the condition of the policy.

2. *Assured must show strict compliance with warranty.*

Stipulations in a policy of fire insurance that the assured will keep his books of account in a fire-proof safe, and that he is the entire, unconditional and sole owner of the property insured, constitute warranties, and a strict compliance with their terms is necessary. While it is error to instruct the jury that *substantial* compliance with such warranties is sufficient, the error is not prejudicial if strict compliance is shown by uncontradicted evidence.

Appeal from Jefferson and Lincoln circuit courts.
JOHN M. ELLIOTT, Judge.

Altheimer Bros. brought suits against the Western Assurance Company and the Imperial Fire Insurance

Company and recovered judgment in both suits. The cases were consolidated on appeal. The facts are stated in the opinion of the court.

*Austin & Taylor* for appellants.

1. The court admitted incompetent testimony. The question to Kaufman and his answer thereto are objectionable, because the question was leading, and required a legal opinion of the witness. 1 Gr. Ev. (14 ed.) sec. 434. The answer usurped the province of the jury. 24 Ark. 251; Thomps. Trials, sec. 377; 63 Tex. 334.

2. It was error to allow Henry Walstein to testify to what was told him. The evidence was hearsay.

3. The question asked Rosenberg was not competent. It seeks an opinion of the witness on an issue that was submitted for decision to the jury. 1 May, Insurance, sec. 156.

4. Plaintiff's first prayer was error. A *substantial* compliance with *affirmative* and *promissory* warranties is not sufficient. They must be *strictly* and *literally* complied with. May on Ins. secs. 156-7; Angell on Fire Ins. sec. 145; 57 Ark. 279; 61 Am. Dec. 81; 30 N. Y. 136; 21 Conn. 19, 32; 7 Wall. 386; 1 Blatch. 280; 2 Pars. Mar. Law, 401; 55 Vt. 308; 23 Wend. (N. Y.) 525.

5. The second prayer for plaintiff is erroneous. It is in conflict with the real facts, and invades the province of the jury. 53 Ark. 381; 45 *id.* 165; *ib.* 472; *ib.* 256; 52 *id.* 517.

6. The court erred in refusing defendants' third prayer. The manner of keeping the books was not in compliance with the "Iron Safe" clause. 53 Ark. 353; 2 Wood, Ins. sec. 449; 1 Sumner, C. C. 434; 63 N. Y. 111-113; May, Ins. 156; 98 Mass. 381; 57 Ark. 279.

7. The verdict is contrary to the law and the evidence. The books and the evidence show that Altheimer

Bros. were not the owners of the stock. 4 Gray, 451. Mrs. Altheimer and Kaufman were partners in the concern, as to third parties. 14 Ala. 306 ; 58 *id.* 230 ; 52 Ga. 567 ; 53 *id.* 160 ; 26 N. J. L. 293 ; 18 Wend. (N. Y.) 183 ; 54 Ark. 384. A "community of interest in the profits" is clearly shown. 37 Conn. 258 ; 6 Halst. 181 ; Parsons, Cont. 132, 150 ; 2 Harr. & G. 171 ; 30 U. S. 529, 8 Law Ed. 216 ; 36 Mo. 38 ; 88 Am. Dec. 129 ; 15 *id.* 369 ; 5 *id.* 142. If not the sole owners, plaintiffs can not recover. 54 N. W. Rep. 326. The court should have set aside the verdict. 47 Ark. 567 ; 57 Ark. 461 ; 39 *id.* 393 ; Moak's Underhill on Torts. 74.

*Bell & Bridges* for appellees.

1. The objections as to incompetent testimony are not well taken. Rosenberg was an expert. 7 Am. & Eng. Enc. Law, p. 494.

2. The first instruction is not objectionable. The word *substantial* only applies to a compliance with the *promissory* clauses, a *substantial* breach of which avoids the policy. 51 Wis. 37 ; 11 Am. & Eng. Enc. Law, p. 293 ; *ib.* p. 299, sec. 3 ; 54 Ark. 376. But appellants had the full benefit of a strict construction as to proof of loss in their fourth prayer, so they were not prejudiced.

3. Instruction 2 does not invade the province of the jury. 54 Ark. 384 ; *ib.* 346. The third instruction properly refused. The *Pelican Case*, 53 Ark. 353, is not in point. In that case there was an utter *failure* to comply with the clause. In this case *experts* say the books were kept in the usual and customary method, and show a complete record of all sales, etc. 63 N. Y. 111 ; 7 Am. & Eng. Enc. Law, p. 494 ; 36 Iowa, 472 ; 9 N. Y. 183 ; 39 N. Y. 245 ; 58 Miss. 368 ; 43 Oh. St. 270 ; 54 Ark. 376 ; 38 Fed. Rep. 19 ; Wood on Ins. (2nd ed.) p. 174 ; *ib.* 433–4 ; May on Ins. (3d ed.) sec. 173.

5. The arrangement with Kaufman and Mrs. Altheimer did not constitute a partnership. 54 Ark. 346; *ib.* 384; May, Ins. sec. 287c. The question was fairly submitted to the jury on proper instructions, and they found for plaintiffs. 48 Ark. 495; 49 *id.* 122; 46 *id.* 524; 54 *id.* 289, etc.

*J. M. & J. G. Taylor, amici curial.*

The mere fact of receiving a portion of the profits of the business for their services did not make Mrs. Altheimer and Kaufman partners. 28 Fla. 209; 10 So. Rep. 298; 1 Lindley on Part. p. 329; Parson's Part. sec. 366; 76 Ind. 157; Baies on Part. secs. 259-60; 42 Ark. 390; 22 Pick. 151; 54 Ark. 387; 24 How. 543; 95 U. S. 293; 5 Gray, 58; 45 Mich. 188; 130 U. S. 472; 76 N. Y. 55; 87 *Id.* 33; 71 Ill. 148; 7 Iowa, 435; 13 R. I. 27; 145 U. S. 623; Story, Part. sec. 38.

2. Conditions avoiding a policy are construed strictly in favor of assured. Barbour, Ins. sec. 17; 17 Iowa, 176; 4 R. I. 156.

WOOD, J. These suits were to recover upon policies of fire insurance, on a stock of merchandise, dry goods, etc., executed by appellants to appellees in September, 1890. The policy in the Western called for one thousand dollars; and in the Imperial, for fifteen hundred dollars. The fire and loss occurred on the 22nd of January, 1891. Suits were begun in Jefferson county circuit court, April 20, 1891. The first suit was tried there; the second was tried, on a change of venue, in Lincoln county. On the issues joined the causes were submitted to a jury. Verdict and judgment for appellees. On appeal here the cases were consolidated, on their motion.

1. The third, fourth, fifth and sixth assignments of error relate to irregularities in eliciting the testimony of witnesses before the jury, both as to questions propounded by counsel, and the answers of the witnesses.

Trial judges should see that counsel violate none of the rules prescribed for the examination of witnesses. A due regard for the legal production of evidence, and an orderly dispatch of the business, should cause the trial court to act promptly in suppressing leading questions and excluding irrelevant or impertinent answers. We realize, however, the impracticability, if not the impossibility, in many instances, of an adherence to rigid rules, and much must necessarily be left to the good judgment of the judge under whose eye the proceedings are had, to see that no unfair advantage is taken, and that no prejudice results to parties litigant by irregularities of the character complained of here. Taking the whole record of the examination of the witnesses, we find no reversible error in these assignments.

2. The seventh, eighth and ninth assignments are that the verdict was contrary to the law and evidence. These will be disposed of in our discussion of the first and second assignments, which present the only important questions for our determination.

1. Warranty as to keeping books not broken, when.

In each of the policies sued on was the following clause: "The assured, under this policy, hereby covenants to keep a set of books showing a complete record of business transacted, including all purchases and sales both for cash and on credit, together with the last inventory of said business ; and further covenants and agrees to keep such books and inventory securely locked in a fire proof safe at night, and at all times when the store mentioned is not actually open for business, or in some secure place not exposed to a fire which would destroy the house where said business is carried on ; and in case of loss the assured agrees and covenants to produce such books and inventory, and, in the event of a failure to produce the same, this policy shall be deemed null and void, and no suit or action at law shall be maintained thereon for any such loss."

The plaintiffs (appellees) alleged a compliance with this condition of the policy; the defendants (appellants) denied. Was there a compliance?

The only breach of this condition assigned by appellants was a failure by appellees to keep a set of books showing a complete record of the cash sales. The evidence upon this issue was substantially as follows: "It is hereby agreed that the following is a fair sample of the manner in which plaintiffs kept a record of daily sales for cash, as appears on their book of daily sales for cash on page 241 and page 300:

"SATURDAY, NOVEMBER 8TH, 1891.

| Altheimer. | Kaufman. | Theresa. | Oliver. | Nora. | Lena. | Maria. | Smith. | Young. | John. | Ligna. | Raphael. | Spears. | O'Leary. | Leon. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 500 | 25 | 125 | 15 | 40 | 20 | 315 | 210 | 10 | | 100 | 145 | 10 | 25 |
| 20 | 185 | 130 | 150 | 50 | 275 | 425 | 395 | 250 | 125 | | 50 | 15 | 75 | 15 |
| 55 | 100 | 200 | 125 | 35 | 375 | 175 | 10 | 150 | 815 | | 310 | 240 | 55 | 125 |
| 135 | 125 | 20 | 75 | 50 | 25 | 35 | 130 | 350 | 125 | | 815 | 15 | 30 | 75 |
| 75 | 190 | 210 | ... | ... | 300 | 55 | 75 | 605 | 5 | | 100 | 150 | 30 | 15 |
| 10 | 10 | 75 | 475 | 150 | 200 | 25 | 25 | 100 | 170 | | 50 | 160 | ... | 100 |
| 75 | 25 | 110 | | 170 | 100 | 25 | 50 | 50 | .... | | 350 | 5 | 200 | 15 |
| 65 | 100 | 75 | ... | 200 | 5 | 15 | 50 | 1350 | | | 50 | 220 | | 125 |
| 50 | 75 | 15 | 320 | 25 | 10 | 40 | 120 | | | | 100 | 135 | | 475" |

The book-keeper explained the above as follows: "The items of sales made by each clerk for cash are added up, and the total of his sales is put down under his name on the daily cash memorandum book. If a clerk should sell a pair of gloves for one dollar and fifty cents, the cashier would simply put down one dollar and fifty cents under the initial or name of the clerk who made the sale, which would show that the clerk had sold some kind and quality of goods, not mentioned, for one dollar and fifty cents. At night the cashier and the wrapper check off and compare their checks, so as to

see if they correspond, and if any error is detected the clerk is called upon to explain. If everything tallies, the cashier then turns over to me the daily cash memorandum book, and I then go over the additions, and put down under the proper date, in the cash book, the total cash sales for that day. At the end of each month, the aggregate of the daily cash sales for that month was transferred from the cash book to the ledger, and entered to the credit of merchandise account." The book-keeper kept a "*double entry*" set of books, had had ten years experience as such, and, after qualifying himself as an expert, further testified "that the business system of the store secured an *accurate record of the daily cash sales, a complete record.*" Another witness was called, and, after qualifying himself as an expert book-keeper, testified "that he had examined the books of appellees, and that they were kept in the usual and customary method of keeping books, showing a *complete record of all sales for cash* and on credit, and all other business transactions." In answer to a question propounded by appellant's counsel on cross-examination, this expert stated "that the record of the cash sales as they were kept on the books of appellees, *was a complete record.*"

The appellant asked, and the court gave, the following instruction: "The plaintiffs, exhibiting the policy of insurance sued on in this action, contracted with defendant that they would keep a set of books showing a complete record of all business transacted, including all purchases and sales, both for cash and on a credit; and, applying the said contract of insurance to this case, you are instructed that the plaintiffs are bound by this agreement. So, if the jury believe from the evidence that the plaintiffs did not keep a set of books showing a complete record of all business done, including all purchases and sales, both for cash and on a credit, then the said policy

of insurance is null and void, and the jury will return their verdict for defendant." This instruction was on the specific condition in the "iron safe" clause, which appellant claimed had not been complied with; it was in the very language of the contract, and properly declared the law.

The appellant also asked the following, which was refused: "Third. The policy of insurance sued on in this case provides that the insured should 'keep a set of books showing a complete record of all business transacted, including all purchases and sales, both for cash and credit.' The court instructs you, as a matter of law to govern you, that if you find from the evidence that the plaintiffs kept no other record of their sales for cash than an entry made upon their books daily in words, in substance, cash sales, so many dollars (naming the amount), without giving any items of merchandise sold, or the separate amounts for which merchandise was sold, it was not a compliance with that provision of the policy, and it is of no consequence that separate amounts were set down or entered as the result of sales by different salesmen without proof by an entry on the books of what certain merchandise was actually sold, and the jury will find for the defendant."

The learned counsel for appellants, in a vigorous and able argument, insist strenuously that the refusal of this was error, upon the authority of the doctrine announced by this court in *Pelican Insurance Co.* v. *Wilkerson*, 53 Ark. 353. There was no proof in that case by expert book-keepers showing that the system of book-keeping there adopted, as to the cash sales, etc., *was a complete record;* no proof of the custom of merchants as to the method of keeping books; nothing but an imperfect record for the court to construe, without the aid of any testimony by those skilled in the art of book-keeping. True, it is the duty of the courts to con-

strue policies of insurance according to their terms, and in the very language used by the parties, and without any extraneous aids, where the intent of the parties, and the meaning of the terms of the instruments, can be thus ascertained. But where the parties have engrafted into their contract terminology peculiar to a particular trade, art, business, or science, it is always proper, where there is a dispute as to the terms employed, and the true meaning of the instrument, to call in those who are best equipped to give the desired explanation. Such is the case here. May on Ins. sec. 173, p. 174; 1 Greenleaf, Ev. sec. 280; *Brown* v. *Brown*, 8 Met. 576; 7 A. & E. Enc. Law, p. 494, note and authorities. The insurers have stipulated for the keeping of a *"set of books, showing a complete record of all business transacted, including all sales and purchases for cash and credit."*

Book-keeping is defined as "the art of recording, in a systematic manner, the transactions of merchants, traders and other persons engaged in pursuits connected with money ; the art of keeping accounts." In the commercial world, book-keeping has come to be a distinct profession—we might say, an exact science—requiring peculiar adaptation and thorough training on the part of those who would master the subject. We conclude from the evidence, one, to keep a *set of books* such as is required by the "iron safe clause" in a business such as appellees were engaged in, must have acquired by a course of study a knowledge of the system and rules of book-keeping, and by a course of practice have been able to apply them in the varied complications of mercantile relations. Neither courts nor jurors are presumed to be book-keepers. The parties had not stipulated as to the particular kind or system of book-keeping required, to show a complete record, etc. They had stipulated for a "set of books," but the plaintiffs affirming, and the defendants denying, that a "set of books" had been kept

as required by the policy, the court very properly, upon this state of the contention, instructed the jury what the terms of the contract imposed, leaving them to determine from the testimony of the experts, the books themselves, and other evidence, as to whether the conditions had been fulfilled.

In the absence of an express provision to the contrary, the insurers must be held to have contracted with reference to the usages of the trade and custom of merchants, and must have intended only such a *set of books*, showing a complete record, as good bookkeeping prescribed, and such as generally obtained among merchants engaged in business similar to that of appellees. *Sun Ins. Co.* v. *Jones*, 54 Ark. 376 ; *Jones* v. *Southern Ins. Co.* 38 Fed. Rep. 19 ; May on Ins. secs. 179, 179*a*, 179*b* ; Angell, F. & L. Ins. sec. 25, pp. 64–65 ; 1 Wood on Ins. p. 433, secs. 184–185; *May* v. *Buckeye Ins. Co.* 25 Wis. 291.

The court did right in not inaugurating a system of bookkeeping which, according to the proof, was not contemplated by the parties when they entered upon their contract.

3. The policy also contained this clause : "This policy shall be void, and of no effect, if the interest of the assured be other than the entire, unconditional and sole ownership." The question of ownership was submitted to the jury upon instructions from the court (most of them at the instance of appellants) which covered every phase of the evidence. We find no error in the second given for appellees, nor in the refusal to give the eleventh on behalf of appellants. The second required the jury first to determine whether appellees were the owners. This was the real question, and the latter clause might well be treated as surplusage. All the evidence as to partnership in the profits, profits for services, etc., were only incidental to the main issue—

who were the owners of the stock—and germane in so far only as they threw light upon that issue. The court fully declared the law upon these points, and the verdict of the jury is conclusive upon appellants, for there was ample proof to support it.

· 4. The stipulations of the "iron safe" clause constituted an express promissory warranty, and of the clause as to ownership, an affirmative warranty; they were in the nature of conditions precedent to recovery, and a strict compliance with their terms was necessary, according to the intent and understanding of the parties. 1 Wood on Ins. sec. 179; 2 do. sec. 449; 1 May on Ins. secs. 156, 167; Angell, 140; Ellis, Law of Fire and Life Ins. p. 28; 1 Arnould on Ins. sec. 213, p. 557; 3 Kent (12 Ed.), p. 289; *Wood* v. *Hartford Fire Ins. Co.* 13 Conn. 533; 1 Wood, Ins. p. 436. <span style="float:right">2. Warranties must be strictly complied with.</span>

It follows that the first instruction of the court which told the jury "that if plaintiffs have substantially complied with the terms of the policy" they should recover, was erroneous. This instruction, if taken in its literal sense, was not incorrect, because "substantially" means "in a substantial manner; really; solidly; truly; competently." Webster, Dict. But the sense in which it is understood by the profession, and treated by authors upon insurance, and the sense, doubtless, in which it was intended to be applied here, was in contradistinction to a strict or exact compliance. *Aurora Fire Ins. Co.* v. *Eddy*, 55 Ill. 213; *Taylor* v. *Beck*, 13·Ill. 376; 1 May on Ins. p. 184, sec. 183, 184; 1 Wood on Ins. sec. 207.

We do not find, however, that this error could have possibly resulted to the prejudice of appellants, for the court had charged specifically upon both the above clauses, and the proof as to the books being a complete record, according to the most approved methods as practiced usually among merchants, was uncontradicted, This was a fact which appellants might have rebutted,

had it not been true, and had they been inclined to do so.
Under the state of case presented by this record, we do
not see how the jury could have come to any other con-
clusion than that there had been a compliance with the
conditions of the policy.

The judgments of the Jefferson and Lincoln circuit
courts are, therefore, in all things affirmed.