LIVERPOOL & LONDON & GLOBE INS. CO. v. KEARNEY et al.

(Circuit Court of Appeals, Eighth Circuit.   April 10, 1899.)

No. 1,127.

1. INSURANCE—CONSTRUCTION OF POLICY—IRON SAFE CLAUSE.

By a clause in a policy of insurance on a stock of merchandise the insured agreed to keep the books containing a record of his business, together with his last inventory, "securely locked in a fireproof safe at night, * * * or in some secure place not exposed to a fire which would destroy the house where such business is carried on." *Held*, that such clause gave the insured an option to keep the books either in a safe or some other secure place, which option he might exercise at any time, and was not violated by the removal of the books in the night from the safe to a place of safety outside on the approach of a fire to the building, such removal being but an act of prudence; nor did the accidental loss of the inventory during such removal preclude a recovery on the policy.

2. SAME.

A provision of an iron-safe clause in a policy of insurance on merchandise, which, in addition to requiring the insured to keep his books and inventory in a safe or other secure place at night, makes the policy void in the event that he shall fail to produce such books and inventory in case of loss, must be given a reasonable, and not a strictly literal, construction; and, so construed, in connection with the provision for the manner in which the books and inventory shall be kept to insure their safety, it requires the insured to produce them after the fire, if within his power to do so, and casts upon him the responsibility for their loss in all cases where such loss is due to a wrongful or fraudulent act on his part, or to his culpable negligence.

Sanborn, Circuit Judge, dissenting.

In Error to the United States Court of Appeals in the Indian Territory.

This suit is founded on two insurance policies, one for $2,500 and one for $1,000, which were issued by the Liverpool & London & Globe Insurance Company, the plaintiff in error, to T. K. Kearney and J. W. Wyse, composing the firm of Kearney & Wyse, the defendants in error. The policies covered a stock of hardware located in the town of Ardmore, in the Indian Territory, which was destroyed by fire on the morning of April 19, 1895, during the life of the policies. For a defense to the claim made under the policies the defendant company appears to have relied altogether on the following provision of the policy, termed "the iron-safe clause": "The assured under this policy hereby covenants and agrees to keep a set of books showing a complete record of business transactions, including all purchases and sales, both for cash and credit, together with the last inventory of said business; and further covenants and agrees to keep such books and inventory securely locked in a fireproof safe at night, and at all times when the store mentioned in the within policy is not actually open for business, or in some secure place not exposed to a fire which would destroy the house where such business is carried on; and in case of loss the assured agrees and covenants to produce such books and inventory, and, in the event of a failure to produce the same, this policy shall be deemed null and void, and no suit or action at law shall be maintained thereon for any such loss." Noncompliance with this clause was alleged in the defendant's answer, in that the insured did not keep books showing a complete record of their transactions, including all purchases or sales for cash and credit, nor any inventory of said business, or memorandum, securely locked in a fireproof safe at night, or in some secure place not exposed to fire; and in that they did not furnish to the insurer, as a part of their proof of loss, a record of their transactions,—that is, of the sales for cash or credit, or purchases,—or an inventory of their business. There was a verdict and a judg-

ment at nisi prius in favor of the plaintiffs below, which judgment was affirmed by the court of appeals in the Indian Territory. 46 S. W. 414. The defendant below brought the case here on a writ of error.

A. B. Quinton (E. S. Quinton, W. A. Ledbetter, and S. T. Bledsoe, on brief), for plaintiff in error.

A. C. Cruce (W. B. Johnson, W. I. Cruce, and Lee Cruce, on brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The defendant below, against whom the judgment was rendered, assigns several errors in the proceedings of the trial court, but each assignment presents only some special phase of the same general question, namely, whether the trial court properly construed and gave due effect to the "iron-safe clause" of the policy, above quoted in the statement. Concerning the facts of the case there is practically no dispute. On the night of April 18, 1895, between the hours of 1 and 3 a. m., a fire accidentally broke out in a livery stable in the town of Ardmore, which was about 300 yards distant from the plaintiffs' place of business. Efforts to arrest the progress of the conflagration failed, and when it had approached so near to the plaintiffs' place of business that the windows of their store were cracking from the heat, and the building was about to take fire, one of the plaintiffs entered the building for the purpose of removing the books of the firm to a safer place, thinking that it would be better to remove them than to take the chances of their being destroyed by fire. He opened an iron safe in the store, in which they had been deposited for the night, which was called a fireproof safe, and took them therefrom, and to his residence, some distance away. The books consisted of a ledger, a cash book, a day book or blotter, and a small paper-covered book containing an inventory that the firm had taken of their stock on or about January 1, 1895. In the hurry and confusion incident to the removal of the books, the inventory was either left in the safe, and was destroyed, or was otherwise lost, and could not be produced after the fire. The other books, however, were saved, and were exhibited to the insurer after the fire, and were subsequently produced as exhibits on the trial. There was neither plea nor proof that the loss of the inventory was due to fraud or bad faith on the part of the plaintiffs, or either of them. The trial judge charged the jury that the set of books which had been kept, and which were produced on the trial, "were substantially in compliance with the terms of the policy upon that subject," and no exception was taken by the defendant to this part of the charge. The books, though used at the trial as exhibits, do not form a part of the record. For these reasons no question arises as to the sufficiency of the set of books that was kept which we are called upon to consider. It must be taken for granted that it was a proper set of books, as the trial court held. The only substantial ground for complaint seems to be that the inventory was not produced. Does the fact that the inventory was lost under the circumstances afore-

said, and was not produced, vitiate the policies? It will be observed, from reading the "iron-safe clause," that the plaintiffs below did not bind themselves unconditionally to keep their books in a fireproof safe at night, and at all times when the store was not actually open for business. Their engagement was to so keep them, "or in some secure place not exposed to a fire which would destroy the house where such business is carried on." They had an option, therefore, either to keep them in a fireproof safe, or in some other secure place, where they would not be liable to be destroyed by a fire which might destroy their place of business. We perceive no reason why the plaintiffs were not entitled to exercise this option of removing their books to some other safe place at any time, and to exercise it, especially when a conflagration was sweeping towards their place of business, which bid fair to destroy it, and possibly to destroy their books as well, though contained in a safe. It cannot be said, we think, that, having placed the books in the safe on the night of April 18, 1895, at the close of business, they were bound to let them remain there until morning, no matter what might occur, and that in the meantime they lost the right given by the policy to remove and keep them elsewhere. The option was a continuing one, and it was eminently proper, we think, for the plaintiffs to exercise it during the night of the fire, when it became obvious to them that their place of business was about to be destroyed. They acted prudently, doing what any other man of ordinary caution would have done if he entertained lurking doubts as to the fireproof quality of his safe, or was unwilling to have his books buried perhaps for days under a mass of débris.

Counsel for the defendant company direct our attention, however, to the last paragraph of the "iron-safe clause," and urge, in substance, that the stipulation therein contained bound the plaintiffs, in any event, to produce the inventory after the fire; and that, even though it was lost, and cannot be produced, they are not entitled to recover. This argument proceeds upon the theory that the last paragraph of the "iron-safe clause" must be read literally, that it admits of no exceptions or qualifications, and that the failure to produce the books or inventory for any reason vitiates the policies. We cannot assent to this view of the case. Like all contracts made between private parties, and like all statutes, for that matter, they must receive a reasonable interpretation which will not work injustice or lead to absurd consequences. U. S. v. Kirby, 7 Wall. 482; Heydenfeldt v. Mining Co., 93 U. S. 634; Church of Holy Trinity v. U. S., 143 U. S. 457, 460, 461, 12 Sup. Ct. 511; Scott v. Latimer, 33 C. C. A. 1, 89 Fed. 843; Thurber v. Miller, 14 C. C. A. 432, 67 Fed. 371, and 32 U. S. App. 209; Davis v. Bohle, 92 Fed. 325. If it had been the intention of the defendant company that the final paragraph of the "iron-safe clause" should be construed as it now claims, then we perceive no motive for inserting the preceding clause, which required the insured to keep his books in a fireproof safe, or other secure place; and that clause might as well have been omitted, giving him the power to keep his books where he pleased, and making his right to recover dependent upon the actual production of his books, and throwing upon him in

all cases the responsibility for their production.    Again, the construction contended for by the insurer might at times require the insured to produce his books when, without any fault on his part, it would be physically impossible to do so.    For example, if a burglar should blow open a safe containing books, and start a fire which should destroy the insured's books as well as his stock in trade, then he could not recover on a policy containing the "iron-safe clause" construed as we are asked to construe it.    Nor could a person insured under such a policy recover against the insurer if he kept his books in a safe which he had every reason to believe was invulnerable against heat, provided it turned out not to be so, and his books were destroyed by an accidental fire.    These considerations lead us to conclude that the last paragraph of the "iron-safe clause" should not be read literally, and that neither party to the contract intended that it would be so read.    It should be construed, we think, as requiring the insured to produce his books and inventory after a fire, if it is within his power to do so, and as throwing upon the insured the responsibility for the loss of his books and inability to produce them in all of those cases where their loss is due to a wrongful or fraudulent act on his part, or to his culpable negligence.    In the case at bar we cannot say that there was any evidence tending to show that the inventory was lost, and not produced for either of the aforesaid reasons.    The plaintiffs appear to have exercised their right under the policy to remove the books to a more secure place, under circumstances which fully justified their conduct, and we do not find any evidence which tends to convict them of culpable negligence in the manner of exercising that right.    In conclusion we shall only add that the clause of the policy now under consideration has been construed by other courts in cases where the facts were only slightly variant from those disclosed by the present record, and the conclusions reached touching the proper interpretation of the clause are in substantial conformity with those which we have announced, and with the instructions which were given by the trial judge.    Jones v. Insurance Co., 38 Fed. 19, 21; Brown v. Insurance Co., 89 Tex. 590, 35 S. W. 1060; McNutt v. Insurance Co. (Tenn. Ch. App.) 45 S. W. 61; Insurance Co. v. Parker, 61 Ark. 207, 213, 32 S. W. 507.    The judgment of the United States court of appeals in the Indian Territory and of the United States court for the Southern district of the Indian Territory are therefore affirmed.

SANBORN, Circuit Judge (dissenting).    Is opening a fireproof safe in one's place of business in which a book is securely locked, and either taking the book out and losing it, or leaving it in an open safe so that it is burned up by an approaching fire which destroys the building in which it is situated. the performance of an agreement to keep the book "securely locked in a fireproof safe, * * * or in some secure place, not exposed to a fire which would destroy the house where such business is carried on"?    The opinion of the majority answers this question in the affirmative.    I have been unable to resist the conclusion that it should be answered in the negative. The book certainly was not kept securely locked in a safe, nor was

it kept "in some secure place not exposed to a fire which would destroy the house where such business is carried on." On the other hand, the safe was unlocked, and the book was either lost or was actually exposed in the open safe or elsewhere to the fire which burned the house where the business was conducted, and was thereby destroyed. Is losing a book keeping it? Is exposing it to a fire by which it is destroyed keeping it in some secure place not exposed to that fire? It is said that the insured had the option to keep the book securely locked in the safe, or in some secure place not exposed to a fire which would destroy the business house, that this was a continuing option, and that they complied with their contract if they lost the book in transit in the night while they were attempting to exercise this option, and to take it from the safe to another secure place. But is this argument sound? The contract was that "at night, and at all times when the store mentioned in the within policy is not actually open for business," they would keep the book locked in the safe, or in some secure place not exposed to a fire which would burn the building in which the safe was situated. It was that they would keep the book in one of two secure places during all of every night while the store was closed. It was not that they would keep it in one of those places, or in transit between them. They undoubtedly had the right each day to choose in which place they would keep their book during the coming night, but, after the night had come, and after the store was closed, if they took the book from the place which they had selected, and exposed it to the fire against which they had agreed to guard it, I see no escape from the conclusion that they violated their contract, because they no longer kept it in either of the secure places specified; and this, whether they removed it with the intention of transferring it from one place to the other or with some other purpose. They were not keeping it in either place while they were transferring it from one to the other. The contention of the majority here proves too much. If the insured could exercise their option once during the night, and after the store was closed, and expose the book to the danger of fire, they could exercise it many times, and could thus keep the book continually in transit, and in neither of the safe places where they agreed to have it during the entire night. In my opinion, an agreement to keep an article in one of two specified secure places during certain hours of the night is not performed by losing it in transit between them during those hours.

There is another proposition of the majority to which I cannot yield assent. It is that an agreement to safely keep and to produce a book upon the trial of a lawsuit is not broken by a failure to keep and produce it, unless that failure is due to a wrongful or fraudulent act, or to the culpable negligence of the defaulter. The agreement of the insured here was as clear and unambiguous as the English language could make it. It was that they would keep the inventory securely locked in the safe, or in the other secure place specified, each night; that they would produce it in case of a loss under the policy, and that, if they failed to do so, no action upon the policy should be maintained. They failed to keep it in either of the places named in the agreement, and they failed to produce it. It is said, however, that they never

meant to agree to keep it or produce it; that they only intended to contract that they would not by any wrongful or fraudulent act or by any culpable negligence of theirs fail to keep and produce the book; that the contract should be construed according to this latter intention; and that, as the insurance company failed to prove any such fraudulent act or culpable negligence of the insured, there was no evidence of a breach of the agreement, although the defendants in error utterly failed to do the acts which, by the plain terms of the written contract, they agreed to perform.     But there is no evidence of the intention of the parties to this contract except the policy itself. The policy contains no agreement that the defendants in error will not be guilty of fraudulent or wrongful acts or of culpable negligence in their care of the book.     It nowhere mentions these terms, or makes any reference to the subjects which they suggest.     It is only a bald, plain contract to keep the book in one of the places specified, and to produce it.     The terms of this agreement seem to me too plain for construction.     In my opinion, they bring these cases under the familiar rules that, "where the parties have deliberately put their engagements into writing in such terms as to import a legal obligation without any uncertainty as to the object or extent of such an engagement, it is conclusively presumed that the whole engagement of the parties, and the manner and extent of their undertaking, was reduced to writing" (Thompson v. Libby, 34 Minn. 374, 377, 26 N. W. 1; Barnes v. Railway Co., 4 C. C. A. 199, 54 Fed. 87, and 12 U. S. App. 1, 7; Wilson v. Ranch Co., 20 C. C. A. 244, 73 Fed. 994, and 36 U. S. App. 634, 643), and that "contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and, if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary and popular sense" (Imperial Fire Ins. Co. v. Coos Co., 151 U. S. 452, 463, 14 Sup. Ct. 379; Fred J. Kiesel & Co. v. Sun Ins. Office of London, 31 C. C. A. 515, 88 Fed. 246).     Under these rules I am unable to find anything in this contract to indicate that the parties to it intended to make any other agreement than that which it so clearly expressed.     Would it be any defense to an action upon an absolute promise to pay a debt that the debtor only intended to agree that he would not be guilty of any fraudulent act or culpable negligence which would prevent him from paying it, and that he had not been? Would it be the province of the court, in the absence of other evidence, to construe a contract to build a house, to dig a well, to sell a horse, or to do any other act, into an agreement not to commit any fraudulent act or culpable negligence which would prevent the performance of the contract?     The rule that courts may not make new contracts for parties which they never considered, and to which their minds never assented, answers these questions.     The same rule seems to me to apply to an unconditional agreement to keep in a specified place, and to produce, a book.     I can find in such a contract no evidence that the parties to it intended to make any other agreement.     I am unable to see in it any proof that they intended that the insured should not agree to keep and produce the book, but that they should merely contract not to commit any fraudulent act or culpable

negligence that would prevent them from keeping and producing it. The latter contract seems to me to be in the teeth of the former. It destroys the written agreement, and I cannot persuade myself, in the face of its plain terms, that the minds of these parties ever met on a contract to so effectually abrogate it.

If this is the correct view of the meaning of this contract, it is immaterial whether its breach was caused by mistake, carelessness, from culpable negligence, or by an honest purpose to violate the agreement. By the terms of the agreement the insured voluntarily took upon themselves the chances of the effects of their own imprudence, carelessness, purpose, and performance. The record conclusively shows that their failure to perform their contract was not caused by any act of God or the public enemy, or by the interposition of any force which made it impossible for them to fulfill it. The breach is therefore without legal excuse, and its inevitable consequence follows. The agreement was that no action should be maintained upon the policies if the book was not kept and produced. It is conceded on all hands that it was not kept, and that it was not produced; and, in my opinion, the insured were estopped by their agreement and by this fact from maintaining any action upon the policy. This view of the meaning and effect of the "iron-safe clause" of policies of insurance is sustained by the following authorities, which hold that it is "an express promissory warranty in the nature of a condition precedent," and that a strict compliance with its terms is indispensable to a recovery upon a policy which contains it: Assurance Co. v. Altheimer, 58 Ark. 565, 575, 25 S. W. 1067; Insurance Co. v. Parker, 61 Ark. 207, 215, 32 S. W. 507; Kelley-Goodfellow Shoe Co. v. Liberty Ins. Co. (Tex. Civ. App.) 28 S. W. 1027, 1031; American Fire Ins. Co. v. First Nat. Bank (Tex. Civ. App.) 30 S. W. 384, 385; Ostr. Ins. § 238; and Landmann v. Insurance Co., 18 Ins. Law J. (La.) 813, 815, in which the court pertinently said:

"In this case there is no room for interpretation or construction. The language used in expressing the clause is free from ambiguity. It is printed in large type, annexed to the face of, and is clearly a part of, the policy. Its purpose was to enable the company, in case of loss, to procure satisfactory evidence of the extent of the loss, to protect it against unfounded augmentation of the value of the property destroyed, and to enable it to obtain other evidence than that of the assured and his employés, however honest and correct they may be, of the damage sustained. Its purpose was, also, to enable the assured to make his loss mathematically certain, and protect him against unfounded deductions. It was the plain intention of the parties that in the case of loss the books were to be the basis of the adjustment, and to enable them to be produced it was made a part of the policy that they should be kept in an iron safe. This the assured promised to do. The iron-safe clause in the policy is a promissory warranty. Being a warranty,—a part of the contract,— it is in the nature of a condition precedent to a right of recovery, and the parties whose rights are dependent upon such a condition must show they have performed it. 'Agreements legally entered into have the effect of laws on those who have formed them.' Rev. Civ. Code, art. 1901. The court cannot add to or detract from the laws they have made for themselves, or say that the promissory warranty shall not be enforced because it is not material. It is enough that the parties agreed to it, however foolish, improvident, or immaterial it may be."