GAUT *v.* AMERICAN LEGION OF HONOR.

(*Knoxville.* October 26, 1901.)

1. BENEVOLENT ASSOCIATION. *Insurance, by.*

The certificate issued by a fraternal, mutual, benevolent association to its members, promising, upon a stipulated consideration and prescribed conditions, to pay, at the death of the member in good standing, a definite sum to the beneficiary therein named, is a contract of insurance, in all its essential elements, which must be performed in good faith by the association. This contract measures the right of the member and the obligation of the association, and will be enforced by the courts according to its terms. (*Post, pp. 617–619.*)

2. SAME. *Same.*

A clause in the contract of insurance entered into by a fraternal, mutual, benevolent association by which the insuring member agrees "to conform in all respects to the laws, rules, and usages of the order now in force, or which may hereafter be adopted by the same," does not reserve to the association the power to reduce, by amendment of its by-laws or otherwise, without the insured's consent, the amount payable on his certificate. Such by-law is *ultra vires* and void. The contract, in this respect, is inviolable. The reserved right of legislation, under such contract, is one of preservation and not of destruction of the insurance contract. (*Post, pp. 619–624.*)

Case cited and distinguished: K. of P. *v.* La Malta, 95 Tenn., 157.

FROM KNOX.

Appeal from Chancery Court of Knox County. Jos. W. SNEED, Ch.

CHAS. H. BROWN for Gaut.

WRIGHT & FRANTZ and A. J. CARR for American Legion of Honor.

McALISTER, J. The question presented for our decision upon the record is in respect of the right of a benefit association to reduce the amount of the insurance certificate issued to one of its members after the contract is executed. The defendant association having undertaken to enforce such a claim of right, complainant filed this bill to annul the by-law adopted by the association reducing the amount of his benefit certificate, and to have his status as a member of such association determined.

The controversy grows out of the following facts as found by the Court of Chancery Appeals: The defendant is a fraternal, mutual, benevolent society, one of whose features is that of insurance to be paid by annual assessment. The society was organized under the laws of Massachusetts in the year 1878, and the purposes as stated in its charter, are as follows:

"1. To unite fraternally all persons of sound bodily health and good moral character, who are socially acceptable, and between eighteen and sixty-five years of age.

"2. To give all moral and material aid in its power to its members and those dependent upon them.

"3. To educate its members socially, morally, and *intellectually*.

"4. To establish a benefit fund for the relief of sick and disabled members.

"5. To establish a benefit fund from which, on the satisfactory evidence of the death of a member of the order who has complied with all its lawful requirements, a sum not exceeding $5,000 shall be paid to the family, orphans, and dependents, as the members may direct."

The order is governed by what is known as the Supreme Council, which is composed of its officers elected bi-enially from its members, the representatives from Grand Councils and Districts and Past Supreme Commanders. The representatives from Grand Councils and Districts are elected by these Grand Councils, and the Grand Councils are composed of representatives of Subordinate Councils elected by the members of the Subordinate Councils.

While the purposes of the order are set out as above shown in its charter, it is evident that the main purpose and object is that of mutual insurance, and it is with that particular feature of the order that this case deals.

It further appears that complainant applied for membership in the order on March 14, 1882, and his application contained a clause, as follows: "I agree to make punctual payment of all dues and assessments for which I may become liable, and to conform in all respects to the laws, rules, and

usages of the order now in force, or which may hereafter be adopted by the same."

At ,that time the law relative to the payment of death benefits appears to have been as follows: "Five thousand dollars shall be the highest amount paid by this order on the death of a member. This sum shall be ;paid on the death of every sixth degree member, and $4,000 on the death of every fifth.degree member, $3,000 on the death of every fourth degree member, $2,000 on the death of every third degree member, $1,000 on the death of every second degree member, and $500 on the death of every first degree member; *Provided*, however, that should a death occur when one assessment on each member would not amount to over $5,000, then the sum paid shall be a proportionate amount of [one] assessment on each member in good standing in the order at the date of the death, according to the degree of the deceased member, and such amount shall be all that can be. claimed by any one."

The application of the complainant was accepted, and he was elected a member of the order and a certificate was issued as follows: "This certificate is issued to companion James W. Gaut, a member of Pioneer Council, No. 34, A. L. H., located at Knoxville, Tenn., upon evidence received from said council that said companion is a sixth degree contributor to the benefit fund of this order, and upon condition that the statements made by said companion in application for membership in said council,

and the statement certified by said companion to the medical examiner, both of which are filed in the supreme secretary's office, be made a part of this contract, and upon condition that the said companion complies in the future with the laws, rules, and regulations governing the said council and fund, or that may hereafter be enacted by the supreme council to govern said council and fund. These conditions being complied with, the Supreme Council of the American Legion of Honor hereby promises and binds itself to pay out of its benefits to James W. Gaut's estate a sum not exceeding $5,000, in accordance with and under the provisions of the laws governing said fund, upon satisfactory evidence of the death of said companion and upon the surrender of this certificate; *Provided*, that said companion is in good standing in this order at the time of death, and provided also that this certificate shall not have been surrendered by said companion and another certificate issued in accordance with the laws of this order. In witness whereof the Supreme Council of the American Legion of Honor has hereunto fixed the seal and caused this certificate to be signed by its supreme commander, and attested and recorded by its supreme secretary, at Boston, Mass., this April 15, 1882."

In November, 1894, the complainant, J. W. Gaut, made an application to the Supreme Council American Legion of Honor for a change of the beneficiary, and there was issued by the defendant on

November 30, 1894, a benefit certificate for five thousand dollars, payable to his wife, Sarah J. Gaut. This certificate reads as follows:

"This is to certify that James W. Gaut having made application for membership to Pioneer Council No. 34, American Legion of Honor, instituted and located at Knoxville, Tennessee, and passed the requisite medical examination, and been duly initiated into said council, *and this certificate is issued to said companion as evidence of the facts in it contained, and is a statement of the contract existing between said companion and the Supreme Council of the American Legion of Honor.* In consideration of the full compliance with all of the by-laws of the Supreme Council of the American Legion of Honor, now existing or hereafter adopted, and the conditions herein contained, the Supreme Council of the American Legion of Honor hereby agrees to pay Sarah J. Gaut, wife, five thousand dollars, upon satisfactory proof of the death, while in good standing upon the books of the supreme council, of the companion herein named and a full receipt and surrender of this certificate, subject, however, to the conditions, restrictions and limitations following:

"1. That all statements made by the companion in the application for membership, and all answers and questions contained in the medical examination are in all respects true and shall be deemed and taken to be express warranties.

"2.    That said companion shall have paid all as-
sessments called within the time and in the manner
required by the by-laws of the supreme council in
force at the time of the issuance of this certificate,
or as the same may be hereafter amended.

"3.    That all moneys which the supreme council
may advance against this certificate by way of relief
benefit to the companion named herein, for sick and
disability benefits under existing or hereafter enacted
by-laws and regulations, may be deducted at the
death of the companion from the amount payable to
the beneficiaries herein named.

"4.    That in case the companion shall die by
his own hands within three years after admission to
membership, whether sane or insane, the certificate
shall be void, and no liabilities shall exist thereon.
And if his death shall be by his own hand after
three years, the recovery shall only be had for such
fractional part of this certificate as the number of
years the companion has been a member of the order
bears to the whole number of years he would have
been had he lived to be seventy years of age, plus
fifty per centum of the unpaid balance.    If death
shall occur either as the immediate consequent cause
of the excessive use of spirituous liquors, the same
fractional rule shall apply.

"5.    That this benefit certificate is issued by the
supreme council and accepted by the companion herein
named, for himself and beneficiary, upon the express
condition and agreement that in case of any false or

23 P—39

fraudulent statement or misrepresentation or violation of any of the covenants herein contained, the same shall be void.

"In witness whereof, the Supreme Council of the American Legion of Honor has hereunto affixed its corporate seal and caused this certificate to be signed," etc. The law of the order relative to death benefits, at that time, was as follows:

"No. 61. Three thousand dollars shall be the highest amount paid by the order on the death of a member. This sum shall be paid on the death of every member holding a certificate for $3,000, and $2,000 on the death of every member holding a certificate for that amount, and $1,000 on the death of every member holding a certificate for that amount. *Provided*, however, that nothing herein contained shall be construed to in any wise impair the obligation of any benefit certificate heretofore issued for a larger or smaller amount than that authorized by the provisions of this law."

In 1899, said law was amended so as to read as follows: "Two thousand dollars shall be the highest amount paid by the order on the death of a member. This sum shall be paid on the death of every member holding a certificate for $2,000, and $1,000 on the death of every member holding a certificate for that amount, and $500 on the death of every member holding a certificate for that amount; provided, however, that nothing herein contained shall be construed to in any wise impair the obligation of

any benefit certificate heretofore issued for a larger or smaller amount than that authorized by the provisions of this by-law."

At a meeting of the supreme council of the order, held in 1899, a by-law similar to the one now attacked, which proposes to affect all certificates, whether issued before or after the passage of the by-law, was passed, but it was left to the executive committee to say whether it should be promulgated, and that committee decided to refer it back to the session of 1900, to determine whether it should be promulgated, and on August 21 and 22, 1900, the supreme council, at its fourteenth regular session, at Atlantic City, N. J., among other business transacted, passed the by-law which is now attacked, and which reads as follows: "Two thousand dollars shall be the highest amount paid by the order on the death of a member upon any benefit certificate heretofore or hereafter issued. This sum shall be paid upon the death of every member holding a benefit certificate of $2,000 or over, and $1,000 on the death of every member holding a certificate for that amount, and $500 on the death of every member holding a benefit certificate for that amount; *Provided*, that if at the death of said member one full assessment upon each of the members of the order will not amount to the full sum of $2,000, then the amount to be paid to the beneficiaries of said deceased member shall not exceed the amount collected by said assessment

if said member's benefit certificate is for $2,000; one-half the amount if the benefit certificate is for $1,000; one quarter of the amount if the benefit certificate is for $500, and provided that the face value of the benefit certificate shall be paid so long as the emergency fund of the order has not been exhausted, and provided that said member shall, at the time of death, be a member of the order in good standing, and shall have complied with all the laws, rules, and regulations of the order as they now are, or as they may hereafter, from time to time, be altered or amended.''

We do find as a fact that the by-law in question was adopted in good faith by the supreme council, and under the belief that it was for the general interest of the order, and under the belief that if this measure was not taken the dissolution of the order would be the inevitable result. We cannot say positively that their judgment upon this subject was infallibly correct. The matter had been under discussion for some two years, and it was clear that the existing conditions were very damaging to the order, and that it was necessary that something should be done to avoid further withdrawals and to establish a more equitable relation between the members.

As shown by the testimony of the witnesses, the order had been reduced from a membership of some 67,000 to the neighborhood of 12,000, and the certificates of members in class six were rapidly ma-

turing by death, and drawing from other members amounts largely out of proportion to the amounts contributed by this class to liquidate these claims. So it certainly appeared that something had to be done.

We cannot say that no other steps might have been taken to relieve the situation, nor can we find, as a fact, that if this law had not been passed a dissolution of the corporation would inevitably have resulted. It would seem probable that such would have been the result, and, as we say, it is apparent that the legislative council so believed, and we are not prepared to say that their judgment on this matter was erroneous.

The Chancellor sustained the bill, declaring said by-law No. 55 *ultra vires*, unreasonable, null and void, ordered complainant reinstated in the order as a member in good standing, and in the alternative awarded a reference for damages. The Court of Chancery Appeals, by a majority opinion, reversed the decree of the Chancellor, and dismissed the bill, but held that the complainant had, by his tender, preserved his rights to membership to the extent of his $2,000 certificate, and taxed the defendant with one-half of the costs.

Complainant appealed, and assigns as error the holding of the Court of Chancery Appeals that the by-law No. 55, reducing the benefit certificate of complainant, was valid. It is stated in the prevailing opinion of the Court of Chancery Appeals that

the majority are constrained in reaching their conclusion by the opinion of this Court in *Supreme Lodge Knights of Pythias* v. *La Malta*, 95 Tenn., 157. In that case, the certificate was in a benevolent fraternal insurance order, as in this case. The reservation in the application, certificate, and by-laws was in almost exactly the same language as in this case. When Schuman, the deceased member, became a member of the order, there was no by-law making void benefit certificates where the deceased came to his death by his own hand, whether sane or insane. After he became a member, and before his death, such a by-law was passed, or attempted to be passed. Mr. Justice Caldwell, speaking for the Court in that case, said: "His written application for membership in the endowment rank contains this statement: 'I hereby agree to conform to and obey the laws, rules, and regulations of the order governing this rank now in force or that may hereafter be enacted, or submit to the penalties therein contained.' And the certificate of membership recites upon its face that the consideration upon which it is issued is, among other things, the full compliance by Schuman with all the laws governing this rank now in force or that may hereafter be enacted. These stipulations in the application and certificate were binding upon Schuman while he lived, and they are equally binding upon the plaintiffs since his death."

This Court said in that case: "The fact that its enactment was subsequent to the date of his certifi-

cate is rendered unimportant by the stipulations in the application, and in the certificate itself, whereby he bound himself irrevocably to full obedience and submission to all legislation then in existence or thereafter enacted for the government of the endowment rank of which he was becoming a member. Those stipulations, however, though in the broadest terms, must be construed as relating to and embracing only such laws as the order had the legal right to make, and as it should make in a legal and binding form. *Supreme Lodge Knights of Pythias* v. *La Malta*, 95 Tenn., 100.

Judge Wilson, in his dissent from the opinion of the majority, differentiated this case from the La Malta case, and expressed the opinion that said by-law No. 55 is inoperative and void. We quote at length from the very able and forcible opinion of Judge Wilson as follows, to wit:

"At the time complainant joined or became a member of the defendant association, he agreed to abide by all its laws in existence, or that might thereafter be enacted. Some year or more ago, the association, or those representing it in its supreme legislative body, enacted a law to the effect that it would not pay, upon the death of any member, a sum in excess of $2,000 to his beneficiaries. In other words, the association proposed by the legislation, or by-laws, enacted by it to cut down all outstanding policies, or certificates, previously issued by it to members, calling for the payment of over

$2,000. It claims the right and power to do this, under the provision of its law in existence at the time complainant joined it, and which was incorporated in the certificate issued to him, whereby and whereunder members agreed to abide by all the laws then in force, or that might thereafter be enacted. Complainant had paid into the benefit fund of the association before this proposed abatement of his policy, or benefit certificate, something over $4,000. He objected to this legislation, as it is called, and tendered his assessments, as before, upon the basis of his insurance being $5,000. The association refused to receive the tender, saying that it would receive assessments upon . the basis of his policy, or certificate, for $2,000. His bill was filed to compel the association to recognize him as a member entitled to have his beneficiary paid $5,000 at his death, provided he still continued to comply with the laws of the order in respect to the payment of assessments, dues, etc., and to have a decree fixing his status in the association.

The case of *Knights of Pythias* v. *La Malta*, 95 Tenn., is supposed to control this case. That case simply held that, as the member joined the order and became a member of its endowment rank, under the laws governing it at the time he joined, and such others as might be enacted in the future for its government, it was competent for the order, by a properly enacted by-law, to incorporate into all benefit certificates, whether issued before or after the

passage of the by-law, what is known in insurance
law as the suicide clause.    That is, a clause forfeit-
ing all rights under the certificate if the holder kills
himself, whether sane or insane at the time.    It is
not my purpose here to controvert the correctness
of the holding in the La Malta case.    Nor is it
my purpose to argue against the proposition, abund-
antly established by a number of well considered
cases, that benevolent beneficial assessment associa-
tions that carry in their charters, or articled purpose-
poses, a feature insuring their members upon pre-
scribed conditions, have the right, when it is re-
served, to change or modify existing laws for their
government, and that such changes or modifications
in their existing by-laws may go to the extent of
materially altering its methods of conducting its busi-
ness or increasing the burdens upon its insured mem-
bers, provided they are reasonable.    These changes,
or modifications, all range themselves, or ought to
range themselves, in the general field of what is
best to promote the welfare of the mutual associa-
tion, and of the best means and methods of en-
abling it to meet the purpose of its existence and
carry out its contracts.    That when an association
of the character and aim of the defendant issues a
certificate to a member promising to pay at his
death in good standing in it, a definite sum to his
named beneficiary, it enters into a contract, in all
its essential elements, of insurance with him, is set-
tled by an overwhelming weight of authorities in

this country. *State* v. *Merchants, etc., Exchange Society*, 72 Mo., 146; *Commonwealth* v. *Wetherbee*, 105 Mass., 149; *State* v. *Live Stock, etc., Asso.*, 16 Neb., 549; *Minor* v. *Michigan, etc., Asso.*, 63 Mich., 338; *Presbyterian, etc., Fund*, v. *Allen*, 106 Ind., 594; *National Mutual Aid Society* v. *Impold*, 101 Pa. St., 111; *Bankers, etc., Mutual Benefit Assn.* v. *Stapp*, 77 Tex., 517 (S. C., 19 Am. St. Rep., 772), and full note where above cases are cited. See also *Block* v. *Mutual etc., Asso.*, 52 Ark., 201 (S. C., 20 Am. St. Rep., 166), and cases cited.

"The doctrine of these cases, and I think the correct doctrine, is that when the courts are invoked in respect to the insurance engagements of these associations, the contract measures the rights of the one and the obligation of the other party, and relief must be granted, if at all, according to its terms. Niblack on Mutual Benefit Societies, Secs. 163, 164, 165; Bacon on Benefit Societies, Sec. 304; *Holland* v. *Taylot*, 11 Ind., 125; *Union Mutual Asso* v. *Montgomery*, 70 Mich., 587 (S. C., 14 Am. St. Rep., 519, note, and cases cited).

"The argument is, as I understand it, that while the contract measures the rights of the one and the obligation of the other party to it, the contract is, in fact, what the association sees proper to make it by its subsequent legislation, provided that legislation is enacted in good faith and under an honest belief that the pressure of necessity requires it.

Expressed in the briefest form, this seems to me
to mean, if it means anything practical, that these
associations, under the reservation of the right to
change . their by-laws, can, if they honestly deem it
necessary to the perpetuation of their existence, re-
pudiate their insurance contracts with their old mem-
bers, who have paid premiums or assessments for
years, and who, being on the brink of the grave,
in the ordinary and general course of nature are
too old to get insurance elsewhere.    It will not do
to say that the defendant, in the new by-law it in-
terposes here, is not proposing the repudiation of
its contract of insurance with the complainant.    If
·it can cut down his policy from $5,000 to $2,000
by the legislation or by-law passed a year or more
ago, it can next year, under the stress of neces-
sity, in what it may honestly deem best to prolong
its existence (matters which, from the very nature
of its organization, its governing body must, if not
finally, primarily, determine) cut it down to $1,000,
aud thereafter to $500, and thereafter in succession
to a dollar or a cent.    Neither will it do to say,
in my opinion that the by-law in question was legit-
imately adopted, under the right reserved by the
association at the time complainant joined it, to pass
such legislation or by-laws as it deemed essential to
promote the welfare of the order; in other words,
as I view the case, neither complainant nor the
association, when he joined it, agreeing to abide by
the laws then in force or that it might thereafter

enact, contemplated, expected, anticipated, or believed, that, by virtue of this agreement on his part, it had the right or power to change, impair, or practically repudiate the contract of insurance it made with him. The reserved right of legislation, with respect to its by-laws, agreed to by complainant, meant, in fact and in contemplation of law, or ought to be held by the courts to have meant, in order to preserve any regard for the obligation of the insurance contracts, that it could pass by-laws changing the method of doing its business, levying and collecting premiums or assessments from its insured members, and onerating them with additional reasonable duties or burdens for the preservation of their contracts. To express the idea in a different form, the reserved right of legislation was one of preservation and not one of destruction of its insurance contracts. The La Malta case does not stand in opposition to these views. All that case held, relevant to the question here, is, that subsequent legislation of the Pythian order incorporating the suicide clause into the benefit certificates it had issued, and that it expected thereafter to issue to members of its endowment rank, was valid legislation. The argument is, if legislation of these orders providing that the self-destruction of a member, whether sane or insane, is valid as to members joining the order before the passage of such legislation, it follows that the legislation changing the contract of insurance, radically cutting it down, made with members, is

also valid.   The argument involves not only a *non sequitur*, but assumes the question under debate.

"Legislation avoiding contracts of the character in review, in consequence of acts of the assured, whether he be sane or insane, is jurisdictionally different from legislation that radically impairs, changes, and lessens the money contract obligation of the association, and that, too, without basing it upon any act or conduct of its assured member.   One is legislative alteration, impairment, and repudiation of the contract by the will and judgment of the association alone.

"We think these views are sound and impose a proper limitation upon the authority of benefit associations to pass by-laws under the reserved powers of the contract.   Other Courts have reached the same conclusion in passing upon similar by-laws.

"In the case of *Knights Templar and Mason's Life Indemnity Co.* v. *Jarman*, 104 Fed. Rep., 628, it appeared that the application of Jarman for membership in the order contained the following, viz:: 'I further agree, if accepted, to abide by the constitution, rules, and regulations of the company as they now are, or may be constitutionally changed hereafter.'   The laws of the company were afterwards amended, which reduced the amount of indemnity secured by Jarman's policy.   The Court said :

"'In the second place, we observe that it is not a reasonable interpretation of the clause above quoted from the application that the applicant intended to

assent in advance to any changes in its constitution and by-laws which the company saw fit to make, even if they reduced the amount of indemnity which the company had promised to pay in the event of his death, and thereby lessen the value of his policy. He was to occupy a dual relation to the company; first, as one of its members; second, as any other individual having a contract with it. In the former relation, he was willing to be bound by any lawful amendment to the company's constitution and by-laws that the members collectively saw fit to adopt, which concerned the government of the corporation or the mode of transacting its business, and did not impair any of the essential provisions of the contract. He probably foresaw that in the course of time the company might find it expedient to make some changes in its methods of corporate government, or in the mode of transacting its business, or in its rules of discipline; and he doubtless intended to assent to all amendments of the constitution and by-laws which were framed for that purpose, and would not deprive him of any substantial right or benefit secured by his policy. It is not reasonable, however, to suppose that he intended to agree in advance that the company might at any time reduce the promised indemnity to any sum which it found it convenient to pay. The liberal indemnity that was promised by the policy as first drawn may have been and probably was the inducing cause which led Jarman to become a member of the defendant company,

and it would be unreasonable to infer that he intended to agree that after he had paid assessments upon his policy for a period of years, the consideration that had induced him to pay the same might be withdrawn in *whole or in part* without his consent. The record contains no evidence that the deceased member voted for any of the amendments in question or was aware of their adoption during his lifetime. And even if it did appear that he voted for the amendments and was aware of their adoption, the presumption would be that he did so in the belief that the amendments operated prospectively, and not retrospectively, upon antecedent contracts. All contracts, notwithstanding the general words and phrases which they may contain, should receive an interpretation which will accord with the presumed intention of the contracting parties, and will not work an injustice or lead to absurd consequences. *United States* v. *Kirby*, 7 Wall., 482; *Church of Holy Trinity* v. *United States*, 143 U. S., 457, 461; S. C. Sup. Ct., 511; 361 Ed. 226; *Insurance Co.* v. *Kearney*, 36 C. C. A., 265; S. C. 94 Fed., 314.

" 'Applying that rule of interpretation, we are unable to give to the clause found in Jarman's application a construction that would enable the defendant company by a simple amendment to its constitution or by-laws to repudiate a stipulation contained in the policy, which, in the estimation of the policy holder, most likely gave to it its chief value. The views we have expressed are in accordance with

the conclusion heretofore reached by several other Courts, including the trial Court, with respect to the same or kindred questions. *Hale* v. *Union*, 168 Pa. St., 377 (S. C. 31 Atl., 1066); *Wist* v. *Grand Lodge*, 22 Or., 271 (S. C. 29 Pac., 610); *Wheeler* v. *Union*, 92 Hum., 277 (S. C. 36 N. Y. Supp., 734); *Grand Lodge* v. *Sater*, 44 Mo. App., 445, 453; *Voight* v. *Kersten*, 164 Ill., 314 (S. C., 45 N. E., 543; *Startling* v. *Supreme Council*, 108 Mich., 140 (S. C., 66 N. W. P., 340); *Smith* v. *Supreme Lodge*, 83 Mo. (not yet reported, and cases there cited).' "

We may add in conclusion that the motives which led to the enactment of this by-law are wholly immaterial, nor is the reasonableness of the by-law a factor in the decision of the case. As we view the record, it presents simply a question of power on the part of the association, and being of the opinion that the passage of the law was *ultra vires*, other considerations are immaterial.

It results that the decree of the Court of Chancery Appeals will be reversed and the decree of the Chancellor affirmed.