**CENTRAL KANSAS CREDIT UNION, Plaintiff,**

v.

**MUTUAL GUARANTY CORPORATION, Defendant.**

No. 93–4255–SAC.

United States District Court, D. Kansas.

April 7, 1995.

**1532**

Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, for plaintiff.

James L. Grimes, Jr., Foulston & Siefkin, Topeka, KS, and Robert Kirk Walker, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, TN, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant Mutual Guaranty Corporation's (MGC) motion for summary judgment (Dk. 65), on the plaintiff Central Kansas Credit Union's (CKCU) motion for summary judgment (Dk. 69), and on the defendant's objections to a magistrate judge's order (Dk. 104). The court first will consider MGC's motion regarding the settlement agreement and then will address the motions as a group regarding the return of the CKCU's capital contribution and special assessment. For the reasons stated below, the court grants the defendant's motion for summary judgment.

## BACKGROUND

CKCU is a Kansas credit union with its principal offices in Hutchinson, Kansas. Prior to 1982, its deposits had been guaranteed by Secured Savings Credit Union of Wichita, Kansas ("SSCU"). In 1982, SSCU merged with MGC, which is a non-profit public corporation created by the Tennessee Legislature having as its purposes "to aid and assist any member credit union ..., in order that the shareholdings and insured accounts of any individual account holder of a member credit union shall be protected or guaranteed against loss," and to advance the general welfare of its member credit unions. (Dk. 70, Ex. A, MGC's Bylaws).

After the merger, CKCU, like other Kansas credit unions that had been insured with SSCU, entered into a contract of insurance with MGC that incorporated certain terms of SSCU's and MGC's 1982 Merger Agreement. In 1989, a dispute between the Kansas member credit unions and MGC emerged over the credit unions' liability under the merger agreement for a pro rata share of all losses and expenses incurred by MGC with the rehabilitation, merger, liquidation and satisfaction of indemnity obligations of certain credit unions. CKCU settled this dispute in 1990 and paid MGC $266,818.48 in exchange for a full release. CKCU withdrew its membership from MGC in 1992, and MGC pursuant to its bylaws retained CKCU's capital contribution and special assessment.

The plaintiff CKCU brought this action seeking to recover the $266,818.48 settlement it paid MGC and the capital contribution and special assessment it lost upon withdrawing from MGC. The court believes it can resolve the case upon deciding two issues: (1) Are CKCU's claims regarding its liability under the 1982 Merger Agreement barred by reason of its subsequent settlement agreement with MGC?, and (2) Does MGC have a valid and enforceable bylaws provision allowing it to retain one-hundred percent of a credit union member's contributions and assessments upon withdrawal?

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal

Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The court views the evidence and draws any possible inferences in the light most favorable to the non-moving party. *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1117 (10th Cir.1991).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555,

91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of this motion, the court considers the following facts to be uncontroverted.

1. The plaintiff, CKCU, is a credit union organized under Kansas law with its principal office in Hutchinson, Kansas. The defendant, MGC, is a non-profit membership public corporation created in 1974 by the Tennessee legislature.

2. Kansas law requires credit unions to insure the shares of its depositors. SSCU was organized and operated under Kansas law for the primary purpose of insuring the shares of member credit unions. Prior to March 30, 1982, CKCU had its deposits insured by SSCU.

3. On March 30, 1982, State Credit Union Share Insurance Corporation, now known as MGC, and SSCU entered into an agreement, whereby MGC agreed to purchase the assets and assume the liabilities of SSCU as of the date of closing. ("1982 Agreement").

4. Prior to March 30, 1982, several Kansas credit unions insured by SSCU had financial problems that had caused sizeable losses and expenses for SSCU. These credit unions were Hesston, Lawrence Government Services, Capital City, Community Mercantile, Haskell County, Stockton, Tri–State and Phillips Refinery ("financially distressed credit unions").

5. On April 29, 1982, CKCU became a member of MGC upon entering into a contract of insurance with MGC. Under that contract, the parties agreed, *inter alia,* that Tennessee law would govern the contract, that CKCU would comply with MGC's by-laws, that certain terms of the 1982 Agreement would be incorporated by reference,

and that CKCU would be bound by the terms and conditions of the 1982 Agreement.

6. The 1982 Agreement created a special reserve fund to offset losses and expenses incurred with respect to the financially distressed credit unions. It was initially funded by SSCU's net worth. The 1982 Agreement further provided that in the event the special reserve proved insufficient to cover those losses and expenses, MGC would advance the necessary funds and then would be repaid by former members of SSCU who had become members of MGC.

7. In February of 1989, MGC submitted to CKCU a request for payment of CKCU's pro rata share of advances made by MGC pursuant to the special reserve provisions of the 1982 Agreement. MGC sent the same letter to other Kansas credit union members who had agreed to be bound to the 1982 Agreement.

8. A dispute arose between some of the Kansas credit unions and MGC over the amount of the credit unions' liability under the 1982 Agreement. In April of 1989, a number of the Kansas credit unions filed a lawsuit entitled *Telephone Employees Credit Union et al. v. Mutual Guaranty Corporation*, No. 89–CV–871 (Third Judicial District, Shawnee County, Kansas) ("Telephone lawsuit"). CKCU was aware of the Telephone lawsuit but chose not to join it.

9. Pursuant to MGC's notice sent in February of 1989, CKCU paid twenty percent of its pro rata share or $34,087.28 by check dated April 21, 1989.

10. CKCU also had a dispute with MGC over the amount of its liability to MGC under the 1982 Agreement.[1] CKCU's Board of Directors authorized CKCU's president, Ron Ogle, to negotiate a settlement of this dispute.

11. By letter dated August 2, 1989, MGC proposed a settlement of CKCU's liability under the 1982 Agreement for $333,523.10, representing CKCU's pro rata share of the combined settlement offer of $3,750,000. In response, Ron Ogle sent MGC a letter dated August 22, 1989, that counteroffered a combined settlement of $1,970,018. Attached to Ogle's letter were certain terms and conditions to the counteroffer. MGC rejected this counteroffer.

12. In October of 1989, the Kansas Credit Union League ("KCUL"), of which CKCU was a member at the time, proposed a combined settlement offer of $2,500,000. The minutes from CKCU's board meeting indicated its officers had signed a letter of intent in support of that settlement offer. The letter of intent included the following:

> The undersigned credit union agrees to the following general provisions:
>
> . . . .
>
> 3. That this settlement offer will be a full and final settlement for all liabilities resulting from the 1982 agreement merging the state insurance program of Kansas with the company now known as MGC.

A copy of this letter was attached to the minutes of CKCU's board meeting on October 19, 1989. MGC rejected the KCUL settlement offer.

13. By letter dated December 29, 1989, MGC offered a combined settlement of $3,000,000 and an individual settlement with any credit union for its pro rata share of the $3,000,000. MGC offered to settle with CKCU for $266,818.48. The settlement letter provided that: "[s]uch payment will constitute a full settlement and satisfaction of all current and continuing contractual obligations and financial responsibilities in connection with the SSCU problem credit unions and all outstanding SSCU indemnification agreements that have arisen or may arise in the future under the SSCU Agreement." For any credit union that was a party to the pending Telephone lawsuit, MGC specifically conditioned settlement on the member credit union agreeing to enter an order of dismissal with prejudice. On the second page of MGC's settlement letter was a place for the credit union to accept this settlement offer.

1. The plaintiff's efforts to controvert this statement are neither reasonable nor credible. Without a single notable exception, both the testimony and the correspondence from CKCU's president, as well as CKCU's board meeting minutes, establish the fact of CKCU's dispute with MGC over the amount of its liability under the 1982 Agreement.

14. On January 6, 1990, CKCU's board authorized acceptance of MGC's offer to settle for $266,818.48. CKCU's officers signed the acceptance blanks on MGC's settlement offer and dated the acceptance as of January 18, 1990. After signing and accepting the settlement offer, CKCU requested a release form from MGC.

15. In an agreement dated February 28, 1990, the parties again memorialized the terms of their settlement in writing. After receiving credit for its earlier pro rata payment of $34,087.28, CKCU paid the balance of $232,731.20, for a total payment of $266,-818.48.

16. MGC's bylaws required CKCU, among other things, to deposit with MGC an initial capital contribution equal to one percent of CKCU's shares and insured accounts, to deposit each year any additional amounts needed to maintain the initial one percent capital contribution, and to pay MGC for special assessments levied against member credit unions.

17. On October 1, 1987, MGC's Board of Directors voted unanimously in favor of the following resolution:

> BE IT RESOLVED that Article IV, Section G.7.b. of the Bylaws of the Corporation be amended by deleting the word "fees" and substituting in lieu thereof the following language: "including special assessments which are due or have been paid by the withdrawing credit union shall be retained by the Corporation as capital; provided, however if the date of withdrawal from membership in the Corporation which results in the termination of the insurance of all accounts of the credit union occurs prior to October 12, 1987, the capital contributions."

The president of CKCU, Ron Ogle, was a director on MGC's board, and he attended this meeting. By letter dated October 2, 1987, MGC gave formal notice to CKCU of this bylaw amendment.

18. Following the adoption of this bylaw amendment, the president of MGC met with John Rucker, the Kansas Administrator of Credit Unions, and furnished him a copy of the bylaw amendment. "After hearing the explanation, Mr. Rucker agreed that the change in the Bylaws authorizing MGC to retain one hundred percent of the capital contribution of withdrawing credit unions was the proper course of action for MGC." (Gaines Affid. ¶ 2).

19. At the same board meeting on October 1, 1987, MGC's directors passed a resolution that allowed MGC to levy a special assessment against the member credit unions in the amount of one-half of one percent of the shares and insured accounts of the credit unions. The board unanimously adopted the following resolution:

> RESOLVED that to avoid a potential impairment of the Corporation's capital fund, a special assessment to the capital fund in the amount of one half of one percent of the shares and insured accounts of the credit unions shall be levied by the Corporation subject to the approval of the Commissioner of Financial Institutions of the State of Treasurer.

By letter dated October 5, 1987, Tennessee's Commissioner of Financial Institutions approved MGC's special assessment.

20. The minutes from MGC's board meeting on November 20, 1987, show that the minutes from the October 1, 1987, meeting were reviewed and approved. On November 27, 1987, CKCU paid the special assessment without protest.

21. The Kansas legislature amended K.S.A. 17–2246 with an effective date of April 25, 1991. 1991 Kan.Sess.Laws Ch. 78, § 3. The amendment requires every Kansas credit union not currently insured by the National Credit Union Share Insurance Fund ("NCUSIF") to apply for insurance with the NCUSIF within 120 days and to obtain a certificate of insurance from the NCUSIF within 18 months. For those credit unions that did not obtain NCUSIF insurance, the amendment authorized the Kansas Administrator of Credit Unions to liquidate them. Finally, the amendment provided that: "No bylaw amendment of any nonfederal insurer shall be binding upon any Kansas credit union unless and until approved by the Kansas state department of credit unions."

22. CKCU obtained their share insurance coverage from NCUSIF and withdrew its membership from MGC in December of 1992. Over the course of its membership with MGC, CKCU paid capital contributions of $226,684.31 and special assessments of $105,763.45.

## SETTLEMENT AGREEMENT

■ MGC maintains that CKCU is unable to recover the $266,818.48 by now litigating the terms of the 1982 Agreement. CKCU paid that money to MGC not to comply with the terms of the 1982 Agreement but to settle their dispute with MGC over CKCU's liability under that agreement. In order for CKCU to recover its settlement payment now, it must either prove some factual and legal basis for setting aside the settlement agreement or show that its present claims denying liability under the 1982 Agreement were not a part of the settlement agreement.

■ In response, CKCU summarily refers to restitution principles as one legal basis on which it can recover the $266,818.48. As its authority, CKCU cites *Dorchester Exploration Inc. v. Sunflower Elec. Co-op., Inc.*, 504 F.Supp. 926, 937 (D.Kan.1980), and the Restatement of Restitution §§ 1–20 (1937). In *Dorchester,* Judge Kelly looked to § 20 of the Restatement to support his holding "that a person who pays an excessive amount of money to another under the erroneous belief that the parties' contract requires such payment is entitled to restitution of the excess payment." 504 F.Supp. at 937. This rule of law, however, does not apply when the person not only mistakes but disputes the amount owed and then pays an excessive amount in compromise of the disputed liability. Comment a to § 20 and illustration 4 establish this exception for settlements or compromises:

Comment:

a. The rule stated in this Section is applicable both to the case where the payor mistakes the amount due and where he mistakes the amount he pays. In both cases **(unless the claim is disputed and the other receives it by way of compromise** or unless the payee was a bona fide purchaser within the rules state in §§ 13

and 14) the payor is entitled to recover it. . . .

Illustrations:

. . . .

4. A owes B $1,000 and makes various payments on account totaling $600. Both A and B lose account of the amount of payments and, realizing that the amount is uncertain, they estimate that $500 remains due and agree that this amount shall be paid in satisfaction. A pays B $500. He is not entitled to restitution.

(emphasis added). CKCU cannot avail itself of this restitution theory to recover what then was paid in compromise of their disputed liability under the 1982 Agreement.

■ Kansas law favors agreements executed in the compromise and settlement of disputes. *Rickman v. Cone Mills Corp.*, 659 F.Supp. 412, 416 (D.Kan.1987), *rev'd,* 893 F.2d 1340 (10th Cir.1989) (Table); *see Bright v. LSI Corp.*, 254 Kan. 853, 858, 869 P.2d 686 (1994) (Kansas law encourages settlement of disputes). "[I]n the absence of fraud, bad faith or mutual mistake of fact, when two parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate the agreement." *Rickman,* 659 F.Supp. at 416 (citations omitted); *see Welborn v. United States,* 736 F.Supp. 1070, 1071 (D.Kan.1990).

Instead of attacking the settlement agreement on one of these recognized grounds, CKCU insists its "right to seek the return of this [settlement] money" simply was not a part of this settlement agreement. In short, CKCU believes it settled its liability under the 1982 Agreement while still reserving implicitly the right to litigate its liability under the same 1982 Agreement and to recover its settlement payment. For factual support of this novel position, CKCU offers the affidavit of Ron Ogle, its former president, in which he avers:

7. In entering into an agreement dated February 28, 1990, I did not intend to preclude Central Kansas Credit Union from seeking recovery of amounts it paid on Mutual Guaranty Corporation's billings under the 1982 Agreement. Rather, by entering into the agreement, it was my intent to placate the auditors of Central

Kansas Credit Union, who were pressuring Central Kansas Credit Union to cap the extent of Central Kansas Credit Union's liability under the 1982 Agreement. At no time did I intend to release Mutual Guaranty Corporation from any obligation it possessed to return the money, nor did I intend to preclude Central Kansas Credit Union from seeking or obtaining the return of the money.

For legal authority, CKCU cites not a single case that supports or even resembles the position it now takes. For that matter, CKCU does not cite to any general legal proposition consistent with this unique position. Instead, CKCU relies on the general rules of contract interpretation and on the lack of any express provision in the settlement agreement barring such a suit.

█ Together, MGC's offer letter dated December 29, 1989, which CKCU's officers signed and accepted, and the subsequent "Agreement" dated February 28, 1990, are a written settlement agreement and are subject to the same rules that would govern the construction of any other written contract.[2] When parties have carried on negotiations and then reduced their negotiations to a written agreement, it is this written agreement which constitutes the contract between the parties and controls the parties' rights thereto. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 582, 738 P.2d 866 (1987). The overriding goal in the construction of a contract is to effectuate the intent and purpose of the parties which is ascertained, if possible, from the four corners of an instrument. *Heyen v. Hartnett*, 235 Kan. 117, 122, 679 P.2d 1152 (1984).

█ A written contract, free from ambiguity, can be construed as a matter of law. *Wood River Pipeline*, 241 Kan. at 582, 738 P.2d 866. It necessarily follows that whether an ambiguity exists in a written instrument is also a question of law. *Kennedy & Mitchell,*

*Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988). When the provisions of a written agreement are clear and unambiguous, the court must enforce the agreement by its expressed terms in order to give effect to the parties' intentions. *Bank of Oklahoma v. Fidelity State Bank & Trust Co.*, 623 F.Supp. 479, 486 (D.Kan.1985).

█ "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). An ambiguity does not exist unless the application of the rules of interpretation leaves it genuinely uncertain which one of two or more possible meanings is the proper one. *Wood River Pipeline*, 241 Kan. at 582, 738 P.2d 866. There are several relevant rules of interpretation. Beginning with the most basic, terms are given their plain, general, and common meaning. *Wood River Pipeline*, 241 Kan. at 586, 738 P.2d 866. Language used anywhere in the instrument is considered and construed in harmony with other provisions. *Heyen*, 235 Kan. at 122, 679 P.2d 1152. The meaning of a contract should not be assessed from only analyzing a single or isolated provision. *Garvey Center, Inc. v. Food Specialties, Inc.*, 214 Kan. 224, 227, 519 P.2d 646 (1974). If a contract includes a series of writings, all writings that are part of the same transaction are interpreted together. *Burge v. Frey*, 545 F.Supp. 1160, 1169 (D.Kan.1982). Reasonable interpretations, rather than unreasonable ones, are favored by the law. *Seacat v. Mesa Petroleum Co.*, 561 F.Supp. 98, 105 (D.Kan. 1983). Interpretations which vitiate the contract's purpose or reduce its terms to an absurdity should be avoided. *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299 (1979). Under the guise of contract construction, the court must not re-

---

2. Kansas choice of law provisions govern this court's determination of which state's substantive law should apply in interpreting the settlement agreement. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Kansas law recognizes as controlling the law of that state where the last act necessary to complete or form the contract

occurs. *Commercial Union Ins. v. John Massman Contracting*, 713 F.Supp. 1403, 1404 (D.Kan.1989). CKCU's acceptance of MGC's settlement offer occurred in Kansas and was the last act in the formation of their settlement agreement. The court will apply Kansas law in interpreting and enforcing the settlement agreement.

write or insert terms. *Garvey Center, Inc.,* 214 Kan. at 227, 519 P.2d 646.

When the agreement settles a dispute, courts applying Kansas law have said that the agreement "must be construed in light of its language and the circumstances surrounding its making." *In re Estate of Engels,* 10 Kan.App.2d 103, 106, 692 P.2d 400 (1984); *see Welborn v. United States,* 736 F.Supp. at 1071. In construing the settlement agreement, the court's foremost concern is with "ascertaining and then giving effect to the mutual intentions of its makers." *Engels,* 10 Kan.App.2d at 106, 692 P.2d 400.

 Generally, a settlement agreement finally determines the amount in dispute and bars a later attempt to litigate that amount. *Kent v. Continental Insurance Co.,* No. 89–1041–K, 1990 WL 110252, 1990 U.S.Dist. LEXIS 9920 (D.Kan. July 27, 1990); *see Kiler v. Wohletz,* 79 Kan. 716, Syl. ¶ 2, 101 Pac. 474 (1909) ("Where there has been a valid agreement to compromise it is not admissible to go back of the settlement to determine who was in the right in the original contention."); *Minor v. Fike,* 77 Kan. 806, 807, 93 Pac. 264 (1907) ("A compromise and settlement of a **bona fide** dispute, although the amount agreed to be paid may be much less than is actually due, is supported by a consideration, and if fairly made bars a recovery on the claim included in the settlement.").

 A valid settlement agreement is final and conclusive as between the parties on "pre-existing claims directly tied to the settled dispute" and those "issues the parties intended to settle." *Engels,* 10 Kan.App.2d at 106, 692 P.2d 400. In 15A Am.Jur.2d *Compromise and Settlement* § 24 (1976), the general rule is found:

A valid compromise and settlement operates as a merger of, and bars all right to recover on, the antecedent claim or right of action included therein. The compromise agreement is substituted for the antecedent claim or right, and the rights and liabilities of the parties are measured and limited by the terms of the agreement. The antecedent claim is extinguished, and

subsequent litigation based upon it is barred by the compromise and settlement. *See* 15A C.J.S. *Compromise & Settlement* §§ 24, 26–27 (1967). The settlement bar ordinarily extends also to defenses and counterclaims. 15A C.J.S. *Compromise & Settlement* § 25 (1967); *see, e.g., Maltby v. Sumner,* 169 Kan. 417, 424–25, 219 P.2d 395 (1950). "[A] valid compromise agreement concludes defenses and counterclaims with respect to the original claim," and a settling party is "estopped" from using a set-off or counterclaim that existed at the time of settlement unless the parties intended to keep it out of their settlement. *Id.*

The court construes the settlement agreement as barring any later attempt by CKCU to litigate its liability under the 1982 Agreement. First, MGC's letter agreement dated December 29, 1989, reads in part:

Mutual Guaranty Corporation ("MGC") offers to release all former Secured Savings Credit Union ("SSCU") members who became members of MGC from their obligations under the SSCU/MGC Merger Agreement dated March 30, 1982, ("SSCU Agreement") upon the payment to MGC of the total amount of $3 Million in cash at the time of closing. **Such payment will constitute a full settlement and satisfaction of all current and continuing contractual obligations and financial responsibilities in connection with the SSCU problem credit unions and all outstanding SSCU indemnification agreements that have arisen or may arise in the future under the SSCU Agreement.**

(emphasis added). One of the recitals to the subsequent agreement dated February 28, 1990, states that in exchange for CKCU's payment MGC agreed to assume CKCU's current and future liability under the 1982 Agreement. It is plain from both settlement documents that the parties plainly intended their settlement to be full and complete as to the obligations and responsibilities that had arisen or could arise from the 1982 Agreement.

Second, the same documents show that the parties contemplated the settlement would end all litigation regarding liability under the 1982 Agreement. The December letter

agreement forecloses litigation by the member credit unions in providing that:

> As a condition of the settlement with any credit union which is party to the suit of *Telephone Employees Credit Union, et al. v. Mutual Guaranty Corporation, et al.*, which is pending in the District Court of Shawnee County, Kansas, such credit union must agree to the entry of an Order of Dismissal with Prejudice against such credit union.

The February agreement in turn precludes MGC from filing suit or bringing a claim against CKCU under the 1982 Agreement. Neither settlement document mentions reserving a right to litigate any matters under the 1982 Agreement or accounts for the possible costs and expenses in the event of such litigation. Rather than making any accommodation for the possibility of more litigation, the parties expressed in the settlement agreements only an intent to fully resolve their dispute over liability under the 1982 Agreement.

 Granted, neither settlement document expressly addresses the possibility of a subsequent suit by a settling credit union who had not joined the Telephone lawsuit. This, however, is not cause enough to read such a reservation into what otherwise has been shown to be a full and complete settlement of the liability issues under the 1982 Agreement. A contract is not ambiguous merely because it does not address an issue. *Duffin v. Patrick*, 212 Kan. 772, Syl. § 4, 512 P.2d 442 (1973). The settlement documents do not expressly reserve any claims, defenses, or counterclaims for either side. More importantly, the reservation argued by CKCU is not in the nature of something that by its apparent omission the court should infer the parties intended to exclude from settlement.[3] In such circumstances, the more appropriate rule is that "[i]n the absence of language to the contrary, it must be presumed the parties intended to settle the entire dispute." *Engels*, 10 Kan.App.2d at 107, 692 P.2d 400. Favoring a reasonable interpretation over an unreasonable one and an interpretation that does not vitiate the purpose of a full and final settlement over one that would, the court construes the settlement agreement as not reserving, but barring, CKCU's right to litigate its liabilities under the 1982 Agreement. For all of these reasons, the court grants MGC's motion for summary judgment on CKCU's claim for the return of its settlement payment of $266,818.48.

## BYLAW AMENDMENT

Both sides move for summary judgment on CKCU's claim to recover the capital contribution and special assessment it lost upon withdrawing from MGC. In support of its position, CKCU argues the same eight points that the other credit unions earlier advanced in the Telephone lawsuit. Judge Bullock soundly rejected all of those arguments and held that the credit unions were not entitled to return of their capital contributions or special assessments from MGC. Though Judge Bullock's written decision was attached to its brief, CKCU avoids addressing the judge's decision or his reasoning. After carefully considering Judge Bullock's decision, the parties' briefs, and the legal authority cited in them, the court finds that it agrees with much, if not all, of Judge Bullock's reasoning and ruling with respect to the contributions and assessments. Consequently, the court will address CKCU's different arguments[4] only briefly.

> *CKCU's antecedent claims.* It would not substitute its terms for what was previously claimed due under the original 1982 Agreement. It would not limit nor measure CKCU's rights and liabilities that had existed under the original agreement. If the parties had intended such a limited settlement, they surely would have expressed it in some way other than by the omission of CKCU's release.

**3.** To read this reservation into the parties' agreement would drastically change the scope and effect of the settlement. What had been a full, final and conclusive settlement of the 1982 Agreement now would be little more than a temporary arrangement in which MGC could enjoy CKCU's settlement payment for some indefinite period while CKCU reserved the right to sue and recover its settlement payment based on its liability under the original 1982 Agreement. This reservation would mean the settlement agreement lacked many of the features of an ordinary settlement agreement. It would not extinguish

**4.** The court agrees with the parties that Tennessee law will govern most of these issues because

*Return of Capital Contribution*

### 1. Impracticability of Performance.

■ CKCU argues that the change in Kansas law requiring it to obtain share insurance from NCUSIF made it impracticable for CKCU to remain a member of MGC. Judge Bullock is correct that this is not an argument "that fits well within the impracticability of performance doctrine." The rationale of this doctrine, as CKCU points out, is that the "basic assumption" on which the parties contract does not cover a changed circumstance and so a party is justly relieved from continued performance. CKCU's argument for applying this doctrine here does not serve this basic rationale. CKCU's continued membership in MGC was not a matter that the parties merely assumed. Rather, the parties expressly agreed in the contract of insurance to the provisions and conditions for withdrawal of membership as well as the consequences. Since 1987, CKCU has known that its withdrawal for whatever reason would mean the loss of its capital contributions. Simply put, CKCU lost its capital contribution not because of a later change in law but because of MGC's enforcement of an existing contract term.

### 2. K.S.A. 17–2255.

■ CKCU interprets K.S.A. 17–2255 as requiring MGC's return of CKCU's capital contribution. This statute provides that the funds the guarantee corporation collects from a credit union "shall belong to the credit union which pays in such funds." The credit union's ownership of the funds, however, is not without condition or exception. In fact, K.S.A. 17–2255 lists some conditions on the credit union's right to withdraw those funds from the guarantee corporation and also makes the funds "subject to reduction incurred as a result of guaranteeing the shares of credit unions." More importantly, K.S.A. 17–2255 does not say or use language which suggests that these enumerated circum-

stances are the only conditions and exceptions to a credit union's ownership of capital contributions.

Specifically, K.S.A. 17–2255 does not prohibit a credit union and the guarantee corporation from agreeing that the credit union will relinquish a portion or all of its capital contribution upon cancellation or withdrawal. This very circumstance is contemplated in K.S.A. 17–2254(e), which sets out certain required terms in written contracts between the guarantee corporation and the credit union:

> Contracts written by a guarantee corporation under the provisions of this act shall provide for:
>
> . . . .
>
> (e) Cancellation by either the credit union or the guarantee corporation and the return of any unused portion of the investment, if any, with penalties; . . . .

Though this provision is hardly a model of statutory draftsmanship,[5] the court submits that the most reasonable reading of it is that the Kansas legislature intended the guarantee corporation's contract to provide that upon cancellation the credit union would have its unused investment returned subject to any contractual penalties.

This interpretation is consistent with the state agency's actions on MGC's contracts of insurance. In 1982, the Kansas administrator of credit unions approved MGC's contract of insurance and MGC's bylaws even though they provided for a penalty of up to 50% of the credit union's capital contribution. Had this provision violated Kansas statute, the administrator presumably would not have approved the contract. K.S.A. 17–2248 (1975). Charged with the enforcement of these statutes, the administrator's interpretation and application of them is entitled to due deference.

---

of the choice of law clause found in their contract of insurance.

**5.** CKCU construes this provision as meaning the guarantee corporation must refund the capital investment and any penalties. CKCU does not

offer any reason for why the Kansas legislature requiring a guarantee corporation to refund penalties. Like MGC argues, if the Kansas legislature had intended to prohibit penalties, it simply could have said so.

### 3. Unenforceable Penalty.

 Resorting to general contract law, CKCU argues that the provision allowing MGC to retain CKCU's capital contribution upon its voluntary withdrawal is an unenforceable penalty. CKCU's contention overlooks the obvious. The Kansas legislature in K.S.A. 17–2254(e), as construed above, approved penalty provisions in such contracts.

### 4. MGC's Power to Amend Bylaws.

 CKCU argues that MGC lacked the authority to increase the withdrawal penalty even though it had generally reserved in the contract of insurance the power to amend its bylaws from time to time. For legal authority, CKCU cites several older cases from the Tennessee Supreme Court for the proposition that a mutual benefit organization's general reservation of the power to amend its bylaws does not authorize an amendment that decreases a member's benefits. *Hazelwood v. Railroad Employees' Mutual Relief Society,* 166 Tenn. 556, 64 S.W.2d 15, 16 (1933); *Gaut v. Supreme Council A.L.H.,* 55 L.R.A. 465, 107 Tenn. 603, 64 S.W. 1070 (1901).

There is a serious question whether the Tennessee Supreme Court would still follow *Hazelwood* in light of modern authorities. Assuming without deciding that *Hazelwood* is good law today, the instant court does not believe that the rule stated in *Hazelwood* precludes most bylaw amendments made pursuant to a general reservation clause. *Hazelwood* represents a narrow exception taken by some courts to what is otherwise a broad general rule:

> In general, applicants for membership in fraternal orders and benefit societies are competent to contract with reference to existing and future bylaws and where a member of such a society agrees to be bound by subsequent changes or amendments, his agreement will or may be enforced, even though his rights are thus injuriously affected. Upon joining a society whose constitution or bylaws make a clear reservation of the right to amend, one is bound to take notice of the existence and effect of that reserved power, as it constitutes one of the provisions of his contract of membership; and not only a member but his beneficiary likewise is bound by a change or amendment of the bylaws under an express reservation of such power.
>
> In some cases the viewpoint has been taken that the power of the society reserved under an open contract clause which refers in some way to the possibility of future changes in the constitution or bylaws does not authorize the society to make changes in the amount of benefits or the conditions under which the benefits are payable.

36 Am.Jur.2d *Fraternal Orders and Benefit Societies* § 20 (1968) (footnotes omitted). *Hazelwood* and certain other cases have barred bylaw amendments which would have changed a member's benefits or the conditions for payment of benefits. The plaintiff does not cite any case where the holding in *Hazelwood* was extended to bar amendments that changed the terms of withdrawing membership from a mutual benefit organization. CKCU equates the two amendments but offers no persuasive reason for doing so. In that regard, CKCU does not demonstrate that the same or similar equities underlying the *Hazelwood* decision are arguably present here. On the weight of the arguments presented, the court does not find *Hazelwood* controlling here.

### 5. Reasonableness of the 1987 bylaws amendment.

 Under Tennessee law, "[a]mendments to the Bylaws of a mutual organization are enforceable as long as they are reasonable and do not deprive a member of a vested right." *Mutual Guaranty Corp. v. Arsenal Credit Union,* 771 F.Supp. 288, 291 (E.D.Mo. 1991). When the facts are undisputed, like here, the reasonableness of the amendment is an issue of law for the court. 36 Am. Jur.2d *Fraternal Orders and Benefit Societies* § 22 (1968). Though CKCU advances several reasons for finding the bylaw amendment unreasonable, the court does not believe that the reasons, individually or cumulatively, justify striking down the amendment.

CKCU does not offer any facts or law from which the court could infer that an amend-

ment increasing the withdrawal penalty from 30% to 100% is unreasonable on its face. There is little doubt that this was a "material change." *Educational Employees Credit Union v. Mutual Guaranty Corporation,* 50 F.3d 1432 (8th Cir.1995). Even so, the amendment seems reasonable from the evidence of record. As reflected in the minutes from the October 1987 meeting of MGC's Board, MGC was facing the withdrawal of endorsements, the negative perception of private insurance, regulatory issues on MGC's capital adequacy, and the potential of state legislation mandating federal insurance. The amendment was a reasonable way for MGC to shore up its capital needs, to strengthen the fund's viability, to work toward a public perception of private insurance being stable and adequately funded, to secure a competitive position with federal insurance, and to slow down withdrawals that could jeopardize MGC's ability to protect remaining members. For these reasons, the amendment plainly advanced the original purposes of MGC to protect and guarantee shareholdings and insured accounts and to advance the general welfare of its member credit unions.

■ Considering MGC's express reservation of the right to amend its bylaws, CKCU's argument about insufficient notice carries little weight. As for the change in Kansas law causing CKCU's withdrawal, the court agrees with Judge Bullock that CKCU is not as innocent as it argues. The Kansas Credit Union League, an association to which CKCU belongs and has actively participated, lobbied for the legislative mandate for NCU-SIF insurance. While he avers that CKCU did not instruct the Kansas League to lobby for this legislation, Ogle omits saying whether CKCU favored the legislation, knew and approved of the Kansas League's efforts, or had any role in encouraging the Kansas League. CKCU inaccurately characterizes MGC as later waiving this same penalty provision for the Tennessee credit unions. What CKCU is referring to is an ownership settlement agreement in which MGC's dissolution and liquidation and a distribution of remaining assets to the remaining members is contemplated. Finally, the court in *Arsenal Credit Union* first stated the general rule that a bylaw amendment must be rea-

sonable and then upheld MGC's right to retain the capital contribution under the 1987 amendment. 771 F.Supp. at 291–92. The court implicitly found that the bylaws amendment was reasonable. The plaintiff has not shown that the amendment is unreasonable or manifestly unfair. Even if it had, CKCU did not challenge this amendment or request that MGC return the capital contributions or special assessment prior to filing this lawsuit. The court believes the doctrine of laches bars CKCU from now challenging this amendment more than five years after learning of it.

### 6. 1991 Amendment to K.S.A. 17–2246.

■ In 1991, the Kansas legislature amended K.S.A. 17–2246 adding in relevant part: "(f) No bylaw amendment of any nonfederal insurer shall be binding upon any Kansas credit union unless and until approved by the Kansas state department of credit unions." CKCU argues this provision applies retroactively to MGC's 1987 bylaw amendment.

The Kansas legislature established an effective date of April 25, 1991, for this amendment. Under Kansas law, a statutory amendment is not given retroactive application "unless its language clearly indicates that the legislature intended that it operate retrospectively." *Nitchals v. Williams,* 225 Kan. 285, 290, 590 P.2d 582 (1979); *Kopp's Rug Co. v. Talbot,* 5 Kan.App.2d 565, 568–69, 620 P.2d 1167 (1980). If the statutory change, however, is "procedural or remedial in nature and does not prejudicially affect the substantive rights of the parties," then " 'all rights of action will be enforced under the new procedure.' " *Nitchals,* 225 Kan. at 291, 590 P.2d 582 (quoting *Jones v. Garrett,* 192 Kan. 109, 115, 386 P.2d 194 (1963)). " '[S]ubstantive law is that which creates duties, rights and obligations, while procedural or remedial law prescribes methods of enforcement of rights or obtaining redress.' " *State v. Chapman,* 15 Kan.App.2d 643, 646, 814 P.2d 449 (1991) (quoting *State, ex rel. Holdridge v. Industrial Commission,* 11 Ohio St.2d 175, 178, 40 O.O.2d 162, 228 N.E.2d 621 (1967)).

CKCU mistakenly argues that this legislative change is procedural in nature. The statutory amendment subjects all bylaw amendments to a state department's scrutiny and possible disapproval. In effect, MGC's board loses the right to decide alone and for itself whether its bylaws need to be amended. This right is a substantive one. Its loss affects MGC's respective powers and duties under the insurance contracts. The state department's disapproval or the possibility of such a disapproval will affect or at least influence MGC's business decisions and practices. The 1991 statutory change is substantive, not procedural, because it affects MGC's contractual rights under existing insurance contracts. *See Nitchals,* 225 Kan. at 291, 590 P.2d 582. The court will not enforce K.S.A. 17–2246(f) (1991) retroactively.

CKCU argues that it is still entitled to recover the funds because MGC did not have a vested right to CKCU's capital contribution when the statutory change became effective in April of 1991. The logic to CKCU's argument escapes the court. The 1991 statutory change does not address a guarantee corporation's right to a credit union's capital contribution; it only speaks to bylaw amendments. As previously stated, the new statutory requirement does not apply to MGC's 1987 bylaws amendment. Consequently, it matters not whether MGC had a vested right in CKCU's capital contribution.

7. CKCU's Signature on 1987 Bylaw Amendment.

■ CKCU here argues that the boilerplate merger clause from the 1982 Agreement was incorporated into its contract of insurance with MGC by the following incorporation clause:

> By the execution of this contract, the Credit Union [CKCU] agrees to be bound by the terms and conditions of that certain agreement, dated March 30, 1982, by and between the Corporation [MGC] and the Secured Savings Credit Union of Kansas, a copy of which Agreement is attached hereto and, to the extent applicable to the Credit Union, is incorporated herein by reference.

CKCU concludes that MGC could not change its contract of insurance by an amended by-law unless CKCU signed it as required by the merger clause in the 1982 Agreement.

CKCU's combined reading of the merger clause from the 1982 Agreement and the incorporation clause from the contract of insurance is untenable. The incorporation clause obligates CKCU, not MGC, to abide by the terms of the 1982 Agreement. There is no basis for concluding that a standard merger clause is "applicable" in any way to CKCU. The contract of insurance expressly gives MGC the right to amend its bylaws and states only one condition to that right, that is, written notice to CKCU of the amendment. The written notice provision would be rendered meaningless and superfluous, if CKCU's signature was required on all amendments.

8. Written Notice of Bylaws Amendment.

■ The contract of insurance provides in relevant part:

> The Credit Union further agrees that this contract may be amended by an amendment to the bylaws of the Corporation, provided the Corporation shall mail written notice of such amendment to the Credit Union at least ten (10) days prior to the effective date of such amendment.

MGC's board adopted the bylaw amendment at issue by resolution on October 1, 1987. According to CKCU, the board made the amendment effective upon adoption; therefore, MGC's letter dated October 2, 1987, announcing the amendment is not timely notice.

The resolution adopted by MGC's board allowed MGC to retain capital contributions and special assessments: "provided, however if the date of [a credit union's] withdrawal from membership in the Corporation which results in the termination of the insurance of all accounts of the credit union occurs prior to October 12, 1987," then the former policy allowing partial return of funds applied. The quoted proviso obviously was intended to meet the ten-day notice requirement. As a practical matter, the proviso made the amendment effective only as to withdrawals occurring after the ten-day notice period. From the evidence of record, the court finds that MGC substantially complied with the

notice requirement. In addition, the court believes this is another instance where the doctrine of laches would preclude CKCU from now asserting lack of notice as a ground to defeat the bylaw amendment.

*Return of Special Assessments*

██ MGC's bylaws allow it to levy a special assessment "[i]n the event of potential impairment of" MGC's capital fund. Because the board's resolution establishing this special assessment reads, "to avoid a potential impairment," CKCU argues MGC did not have authority to levy it. CKCU construes the bylaws as requiring the existence of a "potential impairment" and the board's resolution as acting before a potential impairment existed. The court rejects this hair-splitting contention.

The bylaws contemplate that MGC can levy an assessment once it believes there is the "potential" or possibility for an impairment of its capital. In other words, MGC can act when it has concerns about the adequacy of its capital. The resolution, in effect, states that MGC is levying the assessment to confront and keep away the possibility of a capital impairment. In other words, MGC is acting because it has concerns about the adequacy of its capital funds. The gist of both statements is the same. The court further agrees with Judge Bullock that: "The spirit of both these wordings implies the same thing that MGC may pass a special assessment if it fears a future capital impairment." Moreover, the board's minutes fully reflect what circumstances the board considered in concluding there was a potential impairment of MGC's capital.

## CONCLUSION

CKCU is not entitled to recover its settlement payment or to the return of its capital contribution or its special assessment. By reason of these rulings, the court considers all other pending motions moot.